On August 10, 2001, Tenaska Alabama Partners, L.P. ("Tenaska") sued the Alabama Department of Revenue ("the Department") in the Autauga Circuit Court, challenging the Department's classification and assessment of Tenaska's property as "Class I property" for purposes of the State's ad valorem tax. The Department contended it had made the classification and assessment pursuant to § 217 and Amendments 325 and 373, Alabama Constitution 1901, and § 40-8-1(a), Ala. Code 1975. Tenaska argued that the classification, and thus the assessment, were erroneous and unconstitutional. The circuit court held a hearing on November 10, 2001, and on November 29, 2001, entered a judgment setting aside the Department's classification and assessment of Tenaska's property as "Class I property" and ordering the Department to assess Tenaska's property as "Class II property." On January 4, 2002, the Department appealed.
The material facts of this case are not in dispute. On October 29, 2001, the Department and Tenaska submitted a stipulation of facts. The stipulated facts include the following:
 "1. Tenaska is a Delaware limited partnership that is registered to do business in the State of Alabama.
 "2. Tenaska's Certificate of Limited Partnership and its Application for Registration as a foreign limited partnership filed in the Office of the Secretary of State of Alabama are silent as to the purposes for which Tenaska was formed, and neither states that Tenaska is organized for the purpose of generating, transmitting or distributing electricity or furnishing electricity to the public.
 "3. Tenaska is engaged in constructing in Autauga County, Alabama, a `combined-cycle' combustion turbine fuel conversion facility that will house combined cycle gas turbines capable of producing approximately 846 MW of electricity.
 "4. Tenaska will provide fuel conversion services (i.e., converting natural gas to electricity) to Williams Energy Marketing Trading Company (`Williams').
 "5. Williams is a Delaware Corporation and is not affiliated with, or related to, Tenaska.
 "6. Williams and Tenaska have entered into a long-term Fuel Conversion Services Agreement dated September 5, 1999, pursuant to the provisions of which Tenaska is obligated to maintain the fuel conversion facility so that it is available at any time that Tenaska is called upon by Williams for the conversion of Williams' natural gas to electricity. Williams has exclusive authority to call upon Tenaska for operation of the Autauga County fuel conversion facility. Williams will furnish natural gas and fuel oil owned by Williams to Tenaska for conversion to electricity. Title to the electricity produced from the fuel *Page 965 
conversion facility will belong to Williams when produced and this electricity will be sold in the wholesale electricity market by Williams. Tenaska will not own either the fuel that is converted to electricity for Williams or the electricity that is produced for Williams.
 "7. The fuel conversion facility is being constructed near an electrical substation that was constructed at Tenaska's expense and is owned by Alabama Power Company. Tenaska will make electricity produced from the conversion of Williams' fuel and that is owned by Williams available to Williams via the connection to Alabama Power Company's electrical substation. Tenaska will not own any transmission or distribution facilities over which the electricity is delivered to end-user customers.
 "8. Tenaska is not required by law to obtain, and has not obtained, a certificate of convenience and necessity from the Alabama Public Service Commission for the fuel conversion facility, nor is Tenaska subject to rate or other regulatory supervision of the Alabama Public Service Commission. Tenaska also has no franchise to furnish electricity to the public anywhere in Alabama, and has not undertaken to furnish any service to the public.
 "9. Tenaska has been determined to be an `exempt wholesale generator' or `EWG,' within the meaning of section 32 of the Public Utilities Holding Company Act of 1935, as amended by the Energy Policy Act of 1992, 15 U.S.C. § 79z-5a. Tenaska also has been determined by the Federal Energy Regulatory Commission to be eligible to charge for its services whatever rate Tenaska and its customer may agree to. Hence, the rate charged by Tenaska is not set or approved by the Federal Energy Regulatory Commission.
 "10. By notice dated June 11, 2001, the Alabama Department of Revenue (`Department') informed Tenaska of the Department's preliminary assessment of the value of utility property and notice thereof assessing Tenaska's property located in the state of Alabama during the year 2000 as Class I, i.e., property of utilities used in the business of such utilities, for ad valorem purposes.
 "11. Tenaska contested the Department's assessment of the value of Tenaska's property, presenting Tenaska's position that its property should not be assessed as Class I property for ad valorem purposes at a hearing before the Department on July 2, 2001.
 "12. The Department rejected Tenaska's contest and entered a final assessment of value assessing Tenaska's property as Class I property for ad valorem purposes on July 11, 2001.
 "13. Since the Attorney General of Alabama's issuance of an opinion stating that the property of propane and butane gas dealers should not be assessed for taxation by the Department on September 18, 1950, in response to the request of the Honorable Bert E. Thomas, Tax Assessor, Mobile County, Alabama, the Department has followed this Attorney General's opinion and has not assessed the property of propane and butane dealers for ad valorem purposes.
 "14. To the Department's knowledge, prior to the Department's assessment of Tenaska's property as Class I property for ad valorem purposes, except for the property of rural electric cooperatives and electric membership corporations, the Department had never assessed any property of a purported `electric light or power' company which was not a public utility subject to the regulatory supervision of either (i) the Alabama Public Service Commission, (ii) *Page 966 
a regulatory commission in another state, or (iii) a federal regulatory commission or body, for ad valorem purposes."
In addition to those facts stipulated to by the parties, the record indicates that at the time of the circuit court's hearing in this matter, Tenaska was building a fuel-conversion facility in Autauga County; that that facility was near an electrical substation that was constructed at Tenaska's expense but that is owned by Alabama Power Company; that when it is completed the facility will generate electricity for Williams from the conversion of Williams's natural gas and fuel oil; that that electricity will then be returned to Williams; and that Tenaska's operation is a new development in the electric-power industry.[1] Alabama appellate courts have not considered the issue of how the property involved in an operation such as Tenaska's should be classified for ad-valorem-tax purposes. Further, we have found no caselaw dealing with a situation in which the Department has classified something similar to Tenaska's operation as a "utility" or an "electric power company," as those terms are used in the applicable statutes.
When a case presents no factual disputes and the only issues on appeal deal with the application of the law to undisputed facts, the trial court's judgment receives no presumption of correctness and the review is de novo. State v. American Tobacco Co., 772 So.2d 417 (Ala. 2000). When reviewing the Department's valuation assessment for ad-valorem-tax purposes, this court will affirm the assessment unless it was contrary to applicable law or was arbitrary or capricious. State Dep't of Rev. v.Kennington, 679 So.2d 1059 (Ala.Civ.App. 1995) (reversing the Department's assessment of sales taxes on commissioned portraits painted by the taxpayer); State Dep't of Rev. v. Acker, 636 So.2d 470, 473
(Ala.Civ.App. 1994) (reversing the Department's determination that the shareholders of an Subchapter S corporation were not entitled to an increased basis as a result of loans obtained by the corporation and the shareholders as co-borrowers).
In interpreting a taxing statute, a court must determine "the intention of the legislature . . . primarily . . . from the language of the statute itself if it is unambiguous, and clearly expressed intent must be given effect without room for interpretation," and the court must give the words of the statute "their natural, plain, ordinary, and commonly understood meaning." Alabama Farm Bureau Mut. Cas. Ins. Co. v. City ofHartselle, 460 So.2d 1219, 1223 (Ala. 1984) (citations omitted). However, when the proper interpretation of a taxing statute is in doubt, a court is to construe it strictly in favor of the taxpayer and against the taxing authority. Siegelman v. Chase Manhattan Bank, 575 So.2d 1041,1045 (Ala. 1991). Alabama Farm Bureau Mut. Cas. Ins. Co. v. City ofHartselle, 460 So.2d at 1223; State v. Hall, 278 Ala. 359, 178 So.2d 518
(1965). Further, in determining the applicable law "[w]here the language of a taxing statute is reasonably capable of two constructions," a court must adopt "the interpretation most favorable to the taxpayer." AlabamaFarm Bureau Mut. Cas. Ins. Co., 460 So.2d at 1223.
The Department asserts that the trial court erred in setting aside the Department's assessment of Tenaska's property as Class I property for purposes of the ad valorem tax. The Department argues that §§ 40-8-1
and 40-21-1, Ala. *Page 967 
Code 1975, require that Tenaska's property be classified as Class I property for purposes of ad valorem taxation. Those sections codified the provisions of Amendments 325 and 373 to the Alabama Constitution of 1901. Amendment 373, amending Article XI, § 217, provides, in pertinent part:
 "(a) On and after October 1, 1978, all taxable property within this state, not exempt by law, shall be divided into the following classes for the purposes of ad valorem taxation:
 "Class I. All property of utilities used in the business of such utilities.
"Class II. All property not otherwise classified.
 "Class III. All agricultural, forest and single-family owner-occupied residential property, and historic buildings and sites.
 "Class IV. All private passenger automobiles and motor trucks of the type commonly known as `pickups' or `pickup trucks' owned and operated by an individual for personal or private use and not for hire, rent or compensation.
 "(b) With respect to ad valorem taxes levied by the state, all taxable property shall be forever taxed at the same rate. On and after October 1, 1978, such property shall be assessed for ad valorem tax purposes according to the classes thereof as herein defined at the following ratios of assessed value to the fair and reasonable market value (except as otherwise provided in subsection (j) hereof) of such property:
"Class I. 30 per centum.
"Class II. 20 per centum.
"Class III. 10 per centum.
"Class IV. 15 per centum.
". . . .
 "(g) The legislature is authorized to enact legislation to implement the provisions of this section and may provide for exemptions from taxation; provided, that unless otherwise expressly provided, no amendment to this section shall be construed to repeal any statutory exemption existing on the effective date of any such amendment hereto."
Section 40-8-1, Ala. Code 1975, the statutory provision implementing Article XI, § 217, of the constitution, as amended by Amendment 373, is entitled "Ad Valorem Taxes"; it reads, in part:
 "(a) On and after October 1, 1978, with respect to ad valorem taxes levied by the state, and, unless otherwise provided, with respect to ad valorem taxes levied by a county, municipality, or other taxing authority other than the state, all taxable property shall be divided into the following classes and no other and shall be assessed for ad valorem tax purposes at the following ratios of assessed value to the fair and reasonable market value of such property, or, as may be provided by law, to the current use value of such property:
 "Class I. All property of utilities used in the business of such utilities, 30 percent.
 "Class II. All property not otherwise classified, 20 percent.
 "Class III. All agricultural, forest, and residential property, and historic buildings and sites, 10 percent.
 "Class IV. All private passenger automobiles and motor trucks of the type commonly known as `pickups' or `pickup trucks' owned and operated by an individual for personal or private use and not for hire, rent, or compensation, 15 percent."
Only the provisions relating to Class I and Class II property are relevant to the issue presented in this appeal. Class I *Page 968 
property, "[a]ll property of utilities used in the business of such utilities," is assessed by using a 30% assessment factor, and Class II property, "[a]ll property not otherwise classified," is assessed by using a 20% assessment factor. Both Amendment 373 and § 40-8-1(a), the statutory provision implementing Amendment 373, refer to Class I property as "[a]ll property of utilities used in the business of such utilities." Section 40-8-1(b)(5) defines "property of utilities" as "[a]ll property assessed for taxation by the Department of Revenue pursuant to the provisions of Chapter 21 of this title . . . ." Title 40, Chapter 21, entitled "Public Utilities," in pertinent part, delegates to the Department the power to assess certain property for ad-valorem-tax purposes.[2] Section 40-21-1, Ala. Code 1975, gives the Department the authority to assess the value of
 "all property of . . . all water, electric light or power, hydroelectric power companies, steam heat, refrigerated air, dockage or cranage, toll roads, toll ferries, railroad equipment, pipelines for transporting or furnishing natural, manufactured, or by-product gas, water, oil, gasoline, or other commodities of commerce, and the property of all public service or public utility corporations, and all property not required by law to be listed for taxation with the county tax assessor. . . ."
The term "electric light or power company" is not defined by statute in Alabama.
"Exempt wholesale generators" ("EWGs"), like Tenaska (see paragraph 9 of the stipulated facts), are relatively new to Alabama, and Alabama has no caselaw dealing with EWGs for purposes of ad valorem taxation. However, in State v. Colonial Pipeline Co., 471 So.2d 408 (Ala.Civ.App. 1984), a case both parties rely upon, this court construed many of the statutory provisions at issue in this present case. In Colonial PipelineCo., an oil-pipeline company (hereinafter "Colonial") appealed the Department's assessment of its property as Class I property for ad-valorem-tax purposes. Colonial was a corporation involved in the interstate transportation of petroleum products by pipeline. Some of Colonial's pipelines were located in Alabama and, thus, were subject to Alabama's ad valorem tax. Colonial asserted that because of the nature of its operations, its property was Class II property for purposes of ad valorem taxation. The Department classified Colonial's property as Class I property, i.e., as "property of [a utility] used in the business of such utilit[y]," which was subject to the higher assessment rate. Colonial appealed the Department's assessment to the circuit court. The circuit court held that Colonial's property could not be assessed as Class I property under the authority of Amendment 373, unless Colonial was *Page 969 
determined to be a "utility" as the term "utility" is defined by Alabama law. Further,
 "[t]he trial court [held] that § 40-8-1's definition of Class I property as that property assessed by the Department of Revenue under § 40-21-1
[was] contrary to the provisions of amendment 373 because [the trial court said] it [was] overbroad; [the trial court held that § 40-8-1] converted § 40-21-1 into a taxing statute[;] and [the trial court held that] § 40-21-1 cover[ed] numerous taxpayers which [were] not utilities."
Colonial Pipeline Co., 471 So.2d at 409. The Department appealed.
This court reversed the circuit court's judgment, holding that because pipelines were included in both § 40-21-1 and § 40-21-50, Ala. Code 1975, and because both statutory provisions dealt with "public utilities," those provisions furnished evidence indicating that the Legislature had intended that a pipeline company such as Colonial be considered a "public utility." Colonial Pipeline Co., 471 So.2d at 411. Further, this court held that the classification of Colonial's property as Class I property within the meaning of § 40-8-1, Ala. Code 1975, did not violate Amendment 373 because, it concluded, Colonial had characteristics commonly shared by utilities and thus it was not unreasonable to statutorily classify an operation such as Colonial's as a utility. Id. In reaching that conclusion, this court listed a number of factors that caused Colonial to resemble a utility:
 "Colonial [was] regulated by the Federal Energy Regulatory Commission (FERC). The tariffs which it charge[d] its customers [had to] be filed with the FERC and [were] subject to the Commission's approval. . . . [T]he rates or tariffs allowed to be charged by Colonial [were required to] be filed with the FERC and [were] subject to the Commission's approval. . . . [T]he rates or tariffs allowed to be charged by Colonial [were] based on the valuation of the property of Colonial by the FERC. One of Colonial's witnesses testified to a ten percent (10%) return on equity allowed by the FERC to Colonial based upon its valuation of Colonial's property. . . . The FERC require[d] Colonial to transport goods for any person meeting the minimum standards set by the FERC with regard to batch sizes."
Colonial Pipeline Co., 471 So.2d at 411. This court also held that to treat the property of oil-pipeline companies as Class I "property of utilities" for purposes of ad valorem taxation did not violate constitutional equal-protection guarantees because, the court concluded, there was a rational basis for characterizing the property of oil-pipelines companies as "property of utilities" for purposes of the ad valorem tax.
Unlike Colonial in the Colonial Pipeline case, Tenaska bears none of the usual characteristics of a utility, i.e., none of the characteristics that might make it reasonable to classify Tenaska as a utility. Tenaska is not obligated to serve the public, it has no power of eminent domain, it is not subject to regulation by the Alabama Public Service Commission, and its rates are not established by either the Alabama Public Service Commission or the Federal Energy Regulatory Commission. The Department does not contend that Tenaska has any of these characteristics. In arguing that Tenaska is a utility, the Department emphasizes one characteristic of Tenaska's operation — the fact that Tenaska generates electricity. Relying on that fact, the Department asserts that Tenaska comes within the term "electric light or power . . . compan[y]," as that term is used in § 40-21-1, Ala. Code 1975.
The statute now appearing as § 40-21-1 was enacted in 1935; the 1935 statute was *Page 970 
an administrative statute designed to allow the Department to centrally assess property centrally that was difficult to assess locally (see note 2); it was not a taxing statute. See Act No. 194, Ala. Acts 1935 (Reg. Session); Code 1940, Title 51, § 142; Act No. 95-515, Ala. Acts 1995. It was not until § 40-8-1, Ala. Code 1975, was enacted that the list of property contained in § 40-21-1 came to include not only property that was centrally assessed, but also "property of [a] . . . public utility." From the beginning, the statute focused on property of a sort held by a public utility. Tenaska's sole operation is generating electricity by using the natural resources provided to it and returning electricity in the place of those resources. The Department would have us hold that, because Tenaska's property is centrally assessed under §40-21-1, Ala. Code 1975, Tenaska becomes a "utility" for the purposes of classification and assessment under § 40-8-1, Ala. Code 1975.
We must construe the language of Amendments 325 and 373 and §§40-8-1(a) and 40-8-1(b)(5) in light of the fact that those provisions focus on the term "utilities." "[A] legislative act cannot change the meaning of a constitutional provision." Jansen v. State ex rel. Downing,273 Ala. 166, 169, 137 So.2d 47, 49 (1962). The Legislature's interpretation of a constitutional provision is not controlling where that interpretation would create an unreasonable and irrational result.See Ward v. McDonald, 201 Ala. 237, 244, 77 So. 827, 834 (1918) ("`"Contemporary construction . . . can never abrogate the [constitutional] text; it can never fritter away its obvious sense; it can never narrow down its true limitations; it can never enlarge its natural boundaries."'") (quoting Cooley's Constitutional Limitations (7th ed. p. 105)). To interpret § 40-8-1 and § 40-21-1 as including nonutility property within the classification of Class I property would fundamentally alter the plain text of Amendment 373. See State v.Colonial Pipeline Co., 471 So.2d 408, 411-12 (this court rejected a challenge to the constitutionality of § 40-8-1, Ala. Code 1975; it based its holding on its determination that the taxpayer in question could reasonably be considered a utility for purposes of the ad valorem tax).
We conclude that in order for Tenaska's property to be classified as Class I property for purposes of the ad valorem tax, and thus for its property to be assessed under the 30% assessment factor, Tenaska's operation must come within the terms of § 40-21-1, Ala. Code 1975, and Tenaska's operation must be that of a utility. The Department has failed to demonstrate that Tenaska has such characteristics of a utility as would make it reasonable to classify its property as Class I property (i.e., as "property of [a utility]") for ad-valorem-tax purposes. The circuit court properly set aside the Department's classification and assessment of Tenaska's property as Class I property for ad-valorem-tax purposes and properly ordered the reassessment of that property. The judgment of the circuit court is affirmed.
AFFIRMED.
Yates, P.J., and Pittman and Murdock, JJ., concur.
[1] The Energy Policy Act of 1992, Pub.L. No. 102-486, 106 Stat. 2776, resulted in the deregulation of the electricity industry; wholesale generating facilities such as Tenaska were a product of the deregulation.
[2] Property is assessed for ad-valorem-tax purposes either locally by the county in which the property is located or centrally by the state. Generally, the authority to assess property is given to the state when the nature of the property makes it difficult to assess locally, e.g., when it crosses county lines.
 "Centralized assessment statutes originated in the latter part of the nineteenth century to assess the property of railroads. These statutes were designed `to withdraw the difficult task of assessing fractional parts of a railroad and its property from the hands of local assessors, who could hardly be expected to proceed upon any uniform plan, and each of whom would naturally favor his own particular district.' They also were designed to reach and tax the railroads' large intangible values, which could not effectively be taxed by local assessors. The statutes later were extended to other regulated industries as those industries came into existence."
James A. Amdur, Property Taxation of Regulated Industries, 40 Tax Law. 339, 342-43 (1987).